Slip Op. 11-97

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TRUST CHEM COMPANY LIMITED,<br><br>        Plaintiff,<br><br>              v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>              – and –<br><br>NATION FORD CHEMICAL COMPANY and<br>SUN CHEMICAL CORPORATION,<br><br>        Defendant-Intervenors. | Before: Pogue, Chief Judge<br><br>Court No. 10-00214 |

**<u>OPINION</u>**

[Plaintiff's motion for judgment on the agency record granted in part; Commerce's determination remanded.]

Dated: August 3, 2011

<u>Kutak Rock LLP</u> (<u>Ronald M. Wisla</u> and <u>Lizbeth R. Levinson</u>) for Plaintiff Trust Chem.

<u>Tony West</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director; <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; (<u>Patryk J. Drescher</u>), Attorney; (<u>Alexander V. Sverdlov</u>), Attorney, and, of Counsel, <u>Whitney M. Roliq</u>, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, for Defendant United States.

<u>Pepper Hamilton LLP</u> (<u>Gregory C. Dorris</u>), for Defendant-Intervenors Nation Ford Chemical and Sun Chemical Corp.

**Pogue, Chief Judge:** In this action, Plaintiff Trust Chem

Co., Ltd. ("Trust Chem" or "Plaintiff") seeks review of the final results of the U.S. Department of Commerce's ("Commerce" or "the Department") fourth administrative review of the antidumping order covering Carbazole Violet Pigment 23 ("CVP-23") from the People's Republic of China.[1]

Specifically, Plaintiff claims that Commerce's choice of data to value the nitric acid used to produce the Plaintiff's merchandise is less specific than data Plaintiff submitted, and that Commerce's chosen data is aberrational or unrepresentative of the nitric acid used in producing Plaintiff's goods.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006).

As explained below, the court concludes that Commerce's determination that its data is not aberrational requires reconsideration.

## BACKGROUND

This case arises out of Commerce's 2004 antidumping order on

---

[1] See Carbazole Violet Pigment 23 from the People's Republic of China, 75 Fed. Reg. 36,630 (Dep't Commerce June 28, 2010) (final results of antidumping duty administrative review) ("Final Results") and accompanying Issues & Decision Memorandum, A-570-892, ARP 07-08 (June 21, 2010), Admin. R. Pub. Doc. 63 ("I & D Mem."). The period of review ("POR") was December 1, 2007 to November 30, 2008. Commerce conducts administrative reviews of antidumping duty orders pursuant to Section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675 (2006). Further citation to the Tariff Act of 1930, as amended, is to Title 19 of the U.S. Code, 2006 edition.

CVP-23[2] from China.  Carbazole Violet Pigment 23 from the

People's Republic of China, 69 Fed. Reg. 77,987 (Dep't of

Commerce Dec. 29, 2004) (antidumping duty order).  Commerce

considers China to be a nonmarket economy ("NME").[3]

In administrative proceedings involving goods from an NME,

Commerce may approximate the normal value of the goods based on a

"surrogate" for the value of their "factors of production"

("FOP"). 19 U.S.C. § 1677b(c);[4] see also 19 C.F.R. § 351.408.

The statute provides, however, "that surrogate data used to

calculate the value of factors of production . . . must, to the

extent possible, come from market economy countries with 'a level

_____

[2] CVP-23 is "identified as Color Index No. 51319 and
Chemical Abstract No. 6358-30-1, with the chemical name of
diindolo [3,2-b:3',2'-m]triphenodioxazine, 8,18-dichloro-5,
15-diethy-5,15-dihydro-,and molecular formula of C34H22C12N4O2.[3]
The subject merchandise includes the crude pigment in any form
(e.g., dry powder, paste, wet cake) and finished pigment in
the form of presscake and dry color. Pigment dispersions in any
form (e.g., pigments dispersed in oleoresins, flammable solvents,
water) are not included within the scope of the investigation."
Carbazole Violet Pigment 23 from the People's Republic of China
69 Fed. Reg. 67,304, 67,304 (Dep't Commerce Nov. 17, 2004)
(notice of final determination of sales at less than fair value).

[3] More specifically, because the goods at issue come from
China, Commerce employed its rules and practices for NMEs in
these proceedings. Carbazole Violet Pigment 23 from the People's
Republic of China, 74 Fed. Reg. 68,780, 68,781 (Dep't Commerce
Dec. 29, 2009) (preliminary results of antidumping duty
administrative review) ("Prelim. Results").

[4] FOPs include but are not limited to: hours of labor,
quantities of raw materials, energy and other utilities and
capital cost. 19 U.S.C. § 1677b(c)(3).

of economic development comparable to that of the non-market

economy country.[']" Dorbest Ltd. v. United States, 604 F.3d

1363, 1371 (Fed. Cir. 2010) (quoting 19 U.S.C.

§ 1677b(c)(4)(A)).[5]

Within these statutory limitations, Commerce selects a

specific surrogate value in each individual administrative

proceeding, by choosing the "best available information,"

19 U.S.C. § 1677b(c),[6] which is selected using criteria

established by regulation and practice, generally referred to as

"Commerce's methodology."  Such surrogate values are at issue

here.

Specifically, during the fourth administrative review of

Commerce's antidumping order on CVP-23 from China, Trust Chem

suggested that Commerce use a surrogate value for nitric acid, as

---

[5] Commerce selects surrogate data from "one or more"
surrogate market economy countries. 19 U.S.C. § 1677b(c)(1),(4).
Here, Commerce selected India as the surrogate country.  No party
challenges this choice.

[6] See also Zhejiang Dunan Hetian Metal Co. v. United States,
__ CIT __, 707 F. Supp. 2d 1355, 1360 (2010)("The
term 'best available' is one of comparison, i.e., the statute
requires Commerce to select, from the information before it, the
best data for calculating an accurate dumping margin. The term
'best' means 'excelling all others.' This 'best' choice is
ascertained by examining and comparing the advantages and
disadvantages of using certain data as opposed to other data.")
(citations omitted).

published in the Indian periodical <u>Chemical Weekly</u>,[7] of 9.00

Rupees per kilogram ("INR/Kg."), or $215.31 per metric ton

("USD/MT"). <u>Pl.'s Prelim. Surrogate Value Sub for Prelim.</u>

<u>Determination</u> 4 & Attach. 2, at 22-25 (Sept. 8, 2009) Admin. R.

Pub. Doc. 22.[8]  Defendant-Intervenors Nation Ford Chemical

Company and Sun Chemical Corporation (collectively "Petitioners")

proposed a surrogate value based on nitric acid data from the

Indian Department of Commerce's Export Import Data Bank of 35.08

INR/Kg., or $839.44 USD/MT. <u>Pet'rs' Surrogate Value Data</u> Ex. 21

(Sept. 8, 2009) (PR 21).

    In the preliminary results, Commerce rejected these

surrogate values.  Instead, it utilized data from the Indian

Department of Commerce's Export Import Data Bank, compiled in the

World Trade Atlas ("WTA data"),[9] for HTSUS 2808.00.10, with a POR

---

[7] The <u>Chemical Weekly</u> data includes weekly Indian prices for
certain nitric acid sold in the Mumbai and Bangalore chemical
markets during the POR. Mem. in Supp. of Pl.'s 56.2 Mot. for J.
on the Agency R. 3 ("Pl.'s Br.").

[8] All references to the Admin. R. Pub. Doc. are hereinafter
referred to as ("PR").

[9] WTA data is a secondary electronic source published by
Global Trade Information Services, Inc., which reports the
<u>Monthly Statistics of Foreign Trade of India.</u> <u>Volume II: Imports,</u>
which in turn is published by the Directorate General of
Commercial Intelligence and Statistics of the Ministry of
Commerce and Industry, Government of India. <u>Prelim. Surrogate</u>
<u>Value Mem.</u> 2-3 (referring to http://www.gtis.com/wta.htm.); see
also Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R.
3 n.2 ("Def.'s Br.").

value of $10,474.46 USD/MT. <u>Prelim. Surrogate Value Mem.</u> 5-6

(Dec. 22, 2009) (PR 34) ("<u>Prelim. Surrogate Value Mem.</u>"); <u>Prelim.</u>

<u>Results</u>, 74 Fed. Reg. at 68,783; <u>see also</u> <u>Prelim. Results</u> at

68,782 ("In accordance with [19 U.S.C. § 1677b(a)(1)(C)] we

calculated [normal value ("NV")] based on [FOPs] reported by

Trust Chem for the POR. To calculate NV, we multiplied the

reported per-unit factor consumption rates by publicly-available

Indian surrogate values.").  On the basis of that data, Commerce

preliminarily assigned a dumping margin[10] of 29.57 percent to

Trust Chem. <u>Prelim. Results</u> 74 Fed. Reg. at 68,785.

    In the <u>Final Results</u>, again relying on WTA data, Commerce

assigned Trust Chem a margin of 30.72 percent. <u>Final Results</u>, 75

Fed. Reg. at 36,632.

    Trust Chem now challenges this decision, arguing that:

(A) the data it proposed is more specific[11] to, and hence more

representative of, the nitric acid used in producing the subject

CVP-23, and (B) the WTA data is aberrational or unrepresentative.

    After summarizing the applicable standard of review, the

court will address each of Trust Chem's arguments in turn.

---

    [10] Commerce calculates dumping margins by comparing export
price or constructed export price to the subject merchandise's
normal value in the producer's home or comparison market. <u>See</u>
19 U.S.C. § 1677(35)(A).

    [11] Something that is specific is something "[s]et forth
explicitly[.]" <u>Webster's II Dictionary</u> 1116 (2d ed. 1988).

## STANDARD OF REVIEW

When reviewing the final results of an antidumping proceeding, the court assesses whether Commerce's decision is supported by substantial evidence on the record and in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is "more than a mere scintilla. . . .[and is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]" Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938),[12] "taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984); see also Universal Camera, 340 U.S. at 487.  Thus, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency's action is reasonable. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

"Normally, an agency rule would be arbitrary and capricious [and therefore unreasonable] if the agency has relied on factors which Congress has not intended it to consider . . . [or] entirely failed to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Ins. Co.,

---

[12] See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); Jinan Yipin Corp., v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009).

463 U.S. 29, 43 (1983); SKF USA Inc. v. United States, 630 F.3d

1365, 1374 (Fed. Cir. 2011) (Commerce "has an "obligation' to

address important factors raised by comments from petitioners and

respondents.").


## DISCUSSION

### A. Specificity of the Surrogate Value[13]

First, Plaintiff claims that Commerce's price determination

is not supported by substantial evidence in the record because

Commerce chose the "less specific" WTA data, which has

"undetermined purity[.]" Pl.'s Br. 13.

Plaintiff argues that the Chemical Weekly data is more

specific to its nitric acid, because the Chemical Weekly data is

for nitric acid with a purity level of 60 percent, a level that

is known and thus more product-specific than the unknown purity

level of the WTA data. Id. at 9-10.  Plaintiff adds that this

value could have been "adjusted upward to at least partially

---

[13] Commerce concedes that the Department generally will rely
upon Chemical Weekly data, as opposed to WTA data  when: (1) a
respondent reports the concentration level of its chemical input,
(2) the WTA HTS category does not directly match that input
(i.e., the HTS category is not specific to the product itself),
and (3) the concentration level is known for the prices reported
for that chemical in Chemical Weekly.  I & D Mem. Cmt. 3 at 8-9.
Commerce also concedes that, because the first and third
conditions are met, only the second condition is at issue here.
Id. at 16.

account for the full costs of the higher purity level processing[.]" Id. at 28.

Commerce noted, however, that although the purity or concentration of the nitric acid included in the WTA data was unknown, the Chemical Weekly prices were for 60 percent or "weak" strength nitric acid, as opposed to the "high" strength 98 percent nitric acid used in the production of Trust Chem's merchandise.  Because a simple conversion based on concentrations would not provide an accurate value, Commerce found that the Chemical Weekly prices were not the best available information, but rather the WTA data was the best option. I & D Mem. Cmt. 4 at 16.[14]  Thus, Commerce argues that the WTA data is the appropriate choice, as it is "more specific" than the Chemical Weekly data.

---

[14] Petitioners submitted comments regarding the content and use of nitric acid, elucidating the fact that weak and strong acids are quite different in their costs, value and usage. Pet'rs' Cmts. on New Factual Information Placed on the Record by the Department, 1-2 (May 17, 2010) (PR 57) ("Pet'rs' Cmts."). As discussed in the record, higher production costs are due to the need for "sophisticated chemical process technology and high fixed cost equipment" to get the necessary purity. Id. at 1-2. The higher transport and storage costs are due to the need to use "high purity aluminum railcars and other specialized aluminum or glass containers." Id. at 2; Resp. Br. of Def.-Intervenors in Opp. to Pl.'s Mot. for J. on the Agency R. 4 n.2 ("Def.-Int. Br.").

Def.'s Br. 5, 8-10.[15]  Commerce suggests that Plaintiff bases its specificity argument on "speculation."

To the court, neither party can establish the precise relationship of its data to the 98 percent nitric acid used in the production of Plaintiff's merchandise.  In fact, neither value is more "specific" than the other.

Nevertheless, as long as Commerce reasonably explains its choice between two appropriate but imperfect alternatives, the court will not reject the agency's determination, even if the court would have made a different one. Dorbest Ltd. v. United States, 30 CIT 1671, 1676, 462 F. Supp. 2d 1262, 1269 (2006); Goldlink Indus. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) (The court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information.").[16]

---

[15] Commerce also states that "all other factors being equal, the Department's preference is to utilize the WTA data over the Chemical Weekly data, because the WTA data represent broader market averages." I & D Mem. Cmt. 3 at 10; Def.'s Br. 9; see also Peer Bearing Co.-Changshan v. United States, __ CIT __, 752 F. Supp. 2d 1353, 1372 (2011); China Processed Food Import & Export Co. v. United States, 614 F. Supp. 2d 1337, 1344-46 (2009).

[16] See Globe Metallurgical Inc. v. United States, Slip Op. 11-72, WL 2456542, *7-8. (June 21, 2011) (Where Commerce used an "empirical formula" of matching "technical specifications" of inputs with the surrogate data source.  Commerce used the Indian classification system for coal as opposed to the different Chinese classification system because the Indian system was sufficiently detailed, and because Globe's argument "reli[ed] exclusively on a vague definition of coking coal that lack[ed]

**B. Aberrational Price**

Plaintiff also argues that Commerce's surrogate value choice, based on WTA data, was "aberrational and distortive." Pl.'s Br. 11.  As it did before the agency, Trust Chem asserts four considerations in support of this claim: (1) the extreme numerical differences between the WTA and Chemical Weekly data; (2) the low volume of nitric acid included in the WTA data; (3) the relationship between U.S. import data and the Chemical Weekly data; and (4) Commerce's decision in the original investigation and first administrative review of this order that other WTA data was aberrational.  The court will consider each of these in turn.

**1. Numerical Differences**:  First, Trust Chem avers that the fact that one surrogate value was "50 times greater" than the other should have signaled that the values needed more "careful scrutiny[.]" Id. at 8.  Thus, Plaintiff argues that Commerce should have used Plaintiff's preferred surrogate value calculation, the Chemical Weekly data of $215.31, instead of the aberrational WTA data. Id. at 13.  Plaintiff also contends that it was "absurd" to give nitric acid, "a basic industrial chemical . . . a surrogate value that is higher than such rare and

_____

the empirical rigor of Commerce's approach."). The specificity issue at present is distinguished in that there is one known purity level percentage and one unknown.  However, the fact remains that Plaintiff, like Globe, "does not provide a basis for the court to conclude that Commerce's determination is unreasonable."

expensive material inputs of carbazole violet pigment 23 such as chloranil, nekal and benzene sulfonyl chloride." Id. at 18.[17]

Commerce notes that, under its current methodology, "higher prices alone [do] not necessarily indicate that the price data are distorted or misrepresentative, and thus [are] not sufficient to exclude a particular surrogate value." I & D Mem. Cmt. 4 at 14; see also Tapered Roller Bearings from the People's Republic of China, Issues & Decision Memorandum, A-570-601, ARP 07-08 (Dec. 28, 2009) [(adopted in 75 Fed. Reg. 844) (Dep't Commerce Jan. 6, 2010) (final results of the 2007-2008 administrative review of the antidumping duty order)] 18 ("TRBs from the PRC").

Commerce contends that under its practice, Trust Chem needed to provide "specific evidence" to show that the surrogate value was aberrational, but it failed to do so. I & D Mem. Cmt. 4 at 14. According to Commerce, a difference between WTA data and Chemical Weekly prices is insufficient proof that the WTA data is aberrational. Def.'s Br. 16; I & D Mem. Cmt. 4 at 14-16. Moreover, Commerce asserts that because Trust Chem did not provide data regarding the average unit values ("AUVs") for nitric acid for the other potential surrogate countries, Commerce did not have data to compare with the Indian WTA AUVs to

---

[17] Plaintiff cites to a chart showing the materials mentioned as well as their source prices and POR surrogate values, but does not provide other information to confirm the relative expense and rarity of the materials. Surrogate Values for the Final Results Ex. 2 (June 21, 2010) (PR 61).

determine if they were aberrational. <u>I & D Mem.</u> Cmt. 4 at 14-15.[18]

The court will not disturb this aspect of Commerce's determination.  While Plaintiff correctly notes the large discrepancy in price, the court agrees with Commerce that Plaintiff did not place sufficient comparative data on the record, such as data from other identified potential surrogate countries, to support its challenge based on numerical differences alone.  Thus Commerce's decision not to place weight on the numerical differences between the WTA data and the <u>Chemical Weekly</u> data was not unreasonable.

**2. Import Volume**:  Second, Plaintiff argues that the WTA import volume, upon which the average unit value was based – only 26.2 metric tons of nitric acid during the POR –  was "infinitesimally small," rendering the data aberrational. Pl.'s

----

[18] To corroborate the WTA data, Commerce contends that it considered Petitioners' Global Trade Atlas data from the same HTS category for the same surrogate country over a span of several years (2004-2008).  The data showed a total AUV of $10,700 USD/MT for the five years.

Plaintiff points to the range of AUVs, from a low of $8,690 USD/MT to a high of $17,780 USD/MT, to demonstrate that such a variance is much less steady than the <u>Chemical Weekly</u> data, which shows much less disparity between surrogate values over the years. Pl.'s Br. 16-17; Pl.'s Reply 10; <u>see also</u> <u>Pet'rs' Cmts.</u> Ex. 3.

Defendant-Intervenors note that Plaintiff failed to demonstrate that the price was aberrational, and that the year-to-year fluctuations of Indian import values for nitric acid could in fact also be in line with "normal market forces." Def.-Int. Br. 6.

Br. 8-9.[19]  Plaintiff argues that the POR import volume of 26.2

metric tons cannot be considered representative "[o]n its

face[.]" Id. at 24.

Commerce counters that "small quantities of imports . . .

are not inherently" distortive. I & D Mem. Cmt. 4 at 15; see

also Less-Than-Fair Value Investigation of Certain Lined Paper

Products from the People's Republic of China, Issues & Decision

Memorandum, A-570-901, ARP 6-05 (Aug. 30, 2006) [(adopted in 71

Fed. Reg. 57,079) (Dep't Commerce Sept. 8, 2006) (notice of final

determination) ("Lined Paper Products from the PRC").  In

addition, Commerce argues that Trust Chem did not place any

information on the record to show that "the WTA data [was] not

representative of commercial activity." I & D Mem. Cmt. 4 at 15;

Def.'s Br. 17. See e.g., Sichuan Changhong Electric Co. v. United

States, 30 CIT 1481, 1501, 460 F. Supp. 2d 1338, 1356 (2006)

("Commerce [does] not ha[ve] a longstanding practice of omitting

import values merely because they were the product of a small

quantity of imported goods."); Shakeproof Assembly Components

Div. of Illinois Tool Works, Inc. v. United States, __ CIT __, 59

F. Supp. 2d 1354, 1360 (1999) (citations omitted)(Commerce's

"administrative practice with respect to aberrational data is 'to

---

[19] Plaintiff states that 26.6 metric tons is "slightly more
than one container load," but does not provide any authority for
this contention or provide other relative values for comparison.
Pl.'s Br. 24-25.

disregard small-quantity import data when the per-unit value is
substantially different from the per-unit values of the larger
quantity imports of that product from other countries.'").

In addressing Trust Chem's argument, Commerce states that
the Indian import data the Petitioners put on the record showed
that the POR import quantity (2008) was larger than the
quantities for the years 2004-2007. Therefore, Commerce was not
persuaded by Trust Chem's allegation regarding small import
quantities. I & D Mem. Cmt. 4 at 16.

Notably, as Commerce points out, the question is whether the
*relative* quantity of imports is distortive. Here, Plaintiff did
not introduce evidence, for example, that the WTA volume was only
a small fraction of India's domestic consumption. Def.'s Br.
18.[20] Therefore, on this record, Plaintiff's argument that the
cumulative total for imports from 2004-2008 is too small must
fail.[21]

**3. U.S. Import Statistics:** Third, Plaintiff refers to its
submission of additional U.S. import surrogate value information,
containing an AUV of $349.95 USD/MT. Plaintiff argues that this

---

[20] Defendant-Intervenors also state that the WTA data
Commerce used was comparable to prior years based on the Global
Trade Atlas data on record, and thus reflects the "commercial
reality[.]" Def.-Int. Br. 7.

[21] Defendant also notes that Plaintiff failed to comment on
Petitioners' cumulative data when it was submitted and open for
comment in May 2010. Def.'s Br. 19.

sum corroborates the <u>Chemical Weekly</u> price previously reported
and is further proof that the WTA data is aberrational. Pl.'s Br.
4; Pl.'s Reply 2; <u>see also</u> <u>Pl.'s Surrogate Value Sub. for the
Final Results</u> Attach. 1 (Jan. 19, 2010) (PR 38) ("<u>Pl.'s Surrogate
Value Sub. for Final Results</u>").

Commerce's current methodology, however, "no longer relies
upon U.S. prices as an appropriate benchmark to determine whether
surrogate values are aberrational." <u>I & D Mem.</u> Cmt. 4 at 15.[22]

Plaintiff responds, citing the plain language of 19 U.S.C.
§ 1677b(c)(2).[23]  Plaintiff suggests that the statute "expressly
contemplates the use of sale prices in the United States as a
potential source for surrogate values" if available information
is inadequate. Pl.'s Br. 21.

---

[22] No party challenges Commerce's current methodology or
Commerce's determination that its current methodology must be
applied in the fourth administrative review at issue here. <u>See
FCC v. Fox Television Stations, Inc.</u>, 129 S. Ct. 1800, 1811
(2009) ("[T]he requirement that an agency provide reasoned
explanation for its action would ordinarily demand that it
display awareness that it *is* changing position.  . . . [But] it
suffices that the new policy is permissible under the statute,
that there are good reasons for it, and that the agency *believes*
it to be better, which the conscious change of course adequately
indicates.") (emphasis in original).

[23] ("If [Commerce] finds that the available information is
inadequate for purposes of determining the normal value of
subject merchandise under paragraph (1), [Commerce] shall
determine the normal value on the basis of the price at which
merchandise that is (A) comparable to the subject merchandise,
and (B) produced in one or more market economy countries that are
at a level of economic development comparable to that of the
nonmarket economy country, is sold in other countries, including
the United States.").

Commerce disagrees, arguing that the statute "explicitly allows Commerce to use United States pricing data *only* when that data pertains to imports from countries of 'comparable' economic development to China," as is delineated in § 1677b(c)(2)(B). Def.'s Br. 15.  Commerce states that Trust Chem's claim that this import data was the only available data, and hence is the "best" information, is without merit because the statute provides that § 1677b(c)(2) is an exception to the best available information standard stated in § 1677b(c)(1).  Commerce adds further that the statute does not require Commerce to use benchmarks, and thus Commerce was not obligated to use U.S. import data as a benchmark.

Commerce contends that its decision not to use the U.S. import data was consistent with both the plain language of the statute as well as the agency's established practice of rejecting U.S. import benchmark prices when the relevant imports do not originate from the designated surrogate countries [that are economically comparable to the NME at issue]. Id. at 13. Commerce contends that Trust Chem bore the burden of proving that the WTA surrogate value was aberrational by presenting data for the potential surrogate countries, and it failed to do so.[24]  Id. at 13; see also I & D Mem. Cmt. 4 at 14-15.

---

[24] Plaintiff placed U.S. import data from Canada, Japan, Belgium, Germany, Mexico and the Netherlands on the record instead. Pl.'s Surrogate Value Sub. for Final Results Attach. 1.

The court agrees with Commerce that section 1677b(c)(2) provides an exception for NME cases, applicable where there is available but inadequate information on the record. Ningbo Dafa Chemical Fiber Co. v. United States, 580 F.3d 1247, 1254 (Fed. Cir. 2009).  The exception allows Commerce to use pricing data pertaining to countries of comparable economic development to the country at issue. Zhengzhou Harmoni Spice Co. v. United States, __ CIT __,  617 F. Supp. 2d 1281, 1290 (2009); Kerr-McGee Chemical Corp. v. United States, 185 F.3d 884, 1999 WL 89033, at *1 (Fed. Cir. 1999).  At the same time, there is no statutory prohibition on using U.S. or other market economy data to corroborate record evidence. Peer Bearing Co.-Changshan, 752 F. Supp. 2d at 1372.

Nonetheless, Commerce adequately explained that "while in the past the Department has used U.S. prices to benchmark surrogate values, the Department's current practice has been to benchmark surrogate values against imports from the list of potential surrogate countries for a given case." Lined Paper Products from the PRC Cmt. 5 at 30.

Although there is no prohibition on using U.S. import data, Commerce's preference for data from potential surrogate countries was not unreasonable.

**4. Commerce's Prior Determinations**:  Fourth, Plaintiff states that in Commerce's original investigation, and in the

first administrative review of the antidumping order in this matter, Commerce used Chemical Weekly data as the best surrogate value for nitric acid. Pl.'s Br. 9; see also Pl.'s Surrogate Value Sub. for Final Results at Attach. 2-3,(citing Final Determination of Carbazole Violet Pigment 23 from the People's Republic of China, Issues & Decision Memorandum, A-570-892, ARP 03-04 (Nov. 8, 2004) [(adopted in 69 Fed. Reg. 67,304) (Dep't Commerce Nov. 17, 2004) (notice of final determination of sales at less than fair value)] ("Carbazole Violet Pigment 23 from the PRC").  Specifically, in the investigation, Commerce agreed with Respondents that the Indian import statistics were aberrational, finding WTA data of $4,384.22[25] USD/MT to be aberrational, when compared to a WTA U.S. benchmark import value of $170 USD/MT and a WTA European Union value of $114.43 USD/MT. See Pl.'s Surrogate Value Sub. for Final Results Attach. 2 at 21.  Therefore, Commerce used the Chemical Weekly value of $122.93 USD/MT for nitric acid.

However, during this fourth administrative review, Commerce found the $10,474 USD/MT data, a number significantly higher than the calculation discarded in the earlier determination, to be the best available information for calculating normal value. Pl.'s

---

[25] The court notes that in Pl.'s Surrogate Value Sub. for Final Results Attach. 2 and Carbazole Violet Pigment 23 from the PRC at 21, the price is quoted at $4,384.22; but in Pl.'s Br., the price is quoted at $4,383.22. Pl.'s Br. 15.

Br. 15; see also Pl.'s Surrogate Value Sub. for Final Results

Attach. 2, 20-21.  To explain this deviation from its previous

determination, Commerce argues that its "prior determination used

a now-abandoned methodology that could not have been employed in

this review." Def.'s Br. 15.  Commerce claims that this new

method is better aligned with the statute, and that altering its

methodology is within Commerce's discretion. Id. 16.[26]

Accordingly, relying on its "strong preference for comparing

statistics from the same source[,]" I & D Mem. Cmt. 4 at 15; see

also Lined Paper Products from the PRC at 30, Commerce asserts

that it could not determine that its chosen value (based on WTA

data) in the current review was aberrational because the sources

of comparison (Chemical Weekly) for the values were not the same.

I & D Mem. Cmt. 4 at 15.

---

[26] Defendant-Intervenors add that in the original
investigation and prior reviews, the strength or purity of the
nitric acid was not made an issue.  In contrast, in the present
review, it was confirmed that the high strength nitric acid was
used to produce the subject CVP-23 and that such high strength
nitric acid would be priced at a substantial premium above low
strength nitric acid. Def.-Int. Br. 5 n.3.
    Defendant-Intervenors further contended during the
proceedings below that Trust Chem's argument is "misleading"
because Trust Chem did not explain what occurred during the
intervening years since the original investigation in order to
show that the price of nitric acid could not have risen, Pet'rs'
Rebuttal Br. 2-4 (Feb. 3, 2010) (PR 43), citing increases in
energy and petroleum prices and other factors affecting raw
material prices. Def.-Int. Br. 6.  Here, Defendant-Intervenors
also reiterate Commerce's claim that Trust Chem failed to provide
evidence that the WTA values were too high or that the WTA data
could not be, as reported, based on accurate market conditions at
the time these imports occurred. Id. at 3-5.

Commerce's premise, however – that the sources are not the
same – is a description, not an explanation.  Moreover, in a
previous determination that Commerce cited to in the I & D Mem.,
Commerce stated that, "[w]hile [it] agree[s] . . . that it is
preferable to benchmark selected surrogate values against AUVs
derived from the same data source, for benchmarking purposes,
where [Commerce] had insufficient data from one source, [it] also
compared the AUVs derived from COMTRADE, CAPMAS, and the WTA data
to each other. CAPMAS trade data are specific to Egypt,
therefore, [Commerce] had to benchmark these against data from
COMTRADE and WTA." Hot-Rolled Carbon Steel from Romania Cmt. 2 at
19-20.

In addition, Plaintiff points out that Commerce's chosen
surrogate value is "12 times higher than the inflated surrogate
value [of $839.44 USD/MT] originally requested by the
Petitioner[s] [Nation Ford Chemical and Sun Chemical]." Pl.'s Br.
18.[27]  This important fact does not appear in Commerce's

---

[27] Plaintiff specifically argues that Commerce's
determination yielded "absurd results" because the resulting
value for nitric acid is higher than Petitioners' proposed value.
Pl.'s Br. 18; Def.'s Br. 19.  Commerce responds that this
argument must fail because Plaintiff did not raise the argument
during the administrative proceedings, and thus Plaintiff did not
exhaust its administrative remedies. Def.'s Br. 20.  Commerce
points out that the opportunity to make this argument was in the
February 1, 2010 case brief or the May 17, 2010 submission. See
Pl.'s Revised Case Br. 2 (Feb. 1, 2010) (PR 41); Pl.'s Cmts. on
May 4th DOC Memo on Nitric Acid 1-4 (May 17, 2010) (PR 58).
Certainly Commerce is correct that, unless an appropriate
exception applies, a party is not entitled to judicial relief

extensive analysis.   Rather, Commerce is silent, even though the

Petitioners' submission of what it must regard as a

representative value of the nitric acid at issue is necessarily

an important aspect of the issue presented where Commerce itself

has in the past declined to rely on the higher WTA data.

Moreover, where Petitioners' able counsel presented as

representative a value that is less than eight percent of the WTA

value, it is hard to see how a reasonable mind could infer that

the WTA value is not aberrational.

Consequently, the court cannot affirm Commerce's conclusion.

Certainly, Commerce's new practice of comparing prices between

countries of similar economic development is reasonable and is

therefore entitled to deference.   And, certainly a determination

in one investigation is not binding in the subsequent reviews, as

each determination is *sui generis*, consisting of a unique set of

---

until it has exhausted its administrative remedies. 28 U.S.C.
  § 2637(d); see also Sandvik Steel Co. v. United States, 164
F.3d 596, 599 (Fed. Cir. 1998); see also Mittal Steel Point Lisas
Ltd. v. United States, 548 F.3d 1375, 1383-84. (Fed. Cir. 2008).
In addition, as Commerce notes, by bringing up a general issue, a
Plaintiff has not necessarily exhausted all specific issues under
that general umbrella. Gerber Food (Yunnan) Co. v. United States,
__ CIT __, 601 F. Supp. 2d 1370, 1379 (2009).
  The determinative question is whether Commerce was put on
notice of the issue, not whether Plaintiff's exact wording below
is used in the subsequent litigation.   Here, Commerce was aware
that Plaintiff was contesting the high surrogate value price of
nitric acid.   Moreover, the specific information upon which
Plaintiff relies, having been submitted by the Petitioners, is
necessarily before the agency.   Thus, the argument is not barred
by the doctrine of exhaustion of administrative remedies.

variables and relative factors, U.S. Steel Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1199, 1218 (2009); see also Nucor Corp. v. United States, 414 F.3d 1331, 1340 (Fed. Cir. 2005).

Nonetheless, Commerce's job is to compare the data on the record and provide an explanation that considers the important aspects of the problem presented. SKF USA, Inc., v. United States, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011) (stating that Commerce failed to comply with its *State Farm* obligation to provide an adequate explanation when its explanation failed to consider an important aspect of the problem). It has not done so here.[28]

## CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion for Judgment on the Agency Record is granted in part. This matter is remanded for reconsideration and further explanation in accordance with this opinion.

---

[28] The court notes that the record as it currently stands does not contain specific pricing data from the POR that is representative of  the nitric acid used by the respondent.  Such data could be used for comparison to the WTA data.  It will therefore be appropriate, upon remand, for Commerce to re-open the record.

Commerce shall have until October 3, 2011 to complete and
file its remand redetermination.  Plaintiffs shall have until
November 2, 2011 to file comments.  Defendant and Defendant-
Intervenors shall have until November 17, 2011 to file any reply.


It is **SO ORDERED**.


                                    ____/s/___Donald C. Pogue____
                                    Donald C. Pogue, Chief Judge

Dated:     August 3, 2011
           New York, N.Y.